McKEESPORT AREA SCHOOL
DISTRICT, Petitioner

v.

PROPEL CHARTER SCHOOL
McKEESPORT, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 8, 2005.

Decided Dec. 20, 2005.

---

John F. Cambest, Pittsburgh, for petitioner.

Robert W. O'Donnell, Philadelphia, for respondent.

BEFORE: McGINLEY, Judge, and LEADBETTER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge LEADBETTER.

McKeesport Area School District (School District) petitions this court for review of a State Charter School Appeal Board (CAB) order, which reversed the resolution of the School District's Board of School Directors denying a charter school application to establish Propel Charter School–McKeesport (Propel–McKeesport). The CAB further ordered the School District to grant the charter school application and to execute the charter. Section 1717–A(i)(9) of the Charter School Law (CSL),[1] 24 P.S. § 17–1717–A(i)(9), provides that the CAB's decision to reverse the local board of school directors' decision serves as a requirement for the local board of school directors to grant the application and sign the charter school's written charter.[2]

The history of this case is as follows. On July 21, 2003, the board of school directors of the McKeesport Area School District received an application from Propel Schools (Propel), a Pennsylvania nonprofit corporation incorporated by Jeremy Resnick, to form a charter school, to be known as Propel Charter School–McKeesport. Accordingly, on September 3, 2003, a public hearing was held in the McKeesport Area High School cafeteria. Thereafter, on November 13, 2003, the board of school directors unanimously approved a resolution denying the charter school application.[3] The local board of directors

---

1. Act of March 10, 1949, P.L. 30, *added by* Section 1 of the Act of June 19, 1997, P.L. 225.

2. Pursuant to Section 1703–A of the CSL, 24 P.S. § 17–1703–A (Definitions), a charter school is defined as "an independent public school established and operated under a charter from the local board of school directors and in which students are enrolled or attend. A charter school must be organized as a public, nonprofit corporation. Charters may not be granted to any for-profit entity."

3. Section 1717–A(e)(2) of the CSL, 24 P.S. § 17–1717–A(e)(2) provides:

A charter school application submitted under this article shall be evaluated by the local board of school directors based on criteria including, but not limited to, the following:
(i) The demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students, including comments received at the public hearing held under subsection (d).

denied the application after determining, *inter alia,* that: (1) there was not the requisite demonstrated, sustainable support for the school; (2) the quality of Propel–McKeesport's various programs in reading, math, science and social studies neither met nor exceeded the quality of the School District's educational programs in those areas; (3) Propel–McKeesport's assessment program lacked defined screening instruments and had one less report card for students, no interim report cards, no parent/teacher conferences and no ongoing assessments; (4) Propel–McKeesport was incapable of delivering the full gamut of services to special needs students; (5) Propel–McKeesport was unable to provide a comprehensive educational experience for any student demonstrating aggressive/challenging behavior; (6) Propel–McKeesport failed to budget funds for counseling services, library services, audiovisual services, speech and language support, tutoring, *et cetera,* and also unrealistically allocated the same dollar amount per pupil for special education as for regular education; (7) Propel–McKeesport's proposed facility requires extensive remodeling and is proximate to bars, taverns and a probation office; (8) Propel–McKeesport obviously intends to be part of a regional concept of education, which is not in the best interests of the School District; (9) and the School District is already a model for surrounding area public schools.

Pursuant to Section 1717–A(i) of the CSL, in order to render it eligible to appeal the denial of the charter, Propel obtained the requisite number of signatures, which it then filed with the Court of Common Pleas of Allegheny County (common pleas). Common pleas thereafter ordered that the petition to appeal the denial of the charter was sufficient for purposes of filing an appeal with the CAB. Propel then filed an appeal with the CAB; the CAB appointed a hearing officer, who further developed the record and certified it to the CAB; and, on October 14, 2004, the CAB sustained Propel's appeal and ordered the School District to grant the charter school application.

█ As a result, the McKeesport Area School District filed a petition for review with this court. In its supporting brief, the School District raises the following questions for our consideration: (1) whether Propel failed to meet its burden of presenting evidence of demonstrated, sustainable support for its charter school application; (2) whether Propel failed to meet its burden of demonstrating the capability to provide a comprehensive learning experience to students; and (3) wheth-

(ii) The capability of the charter school applicant, in terms of support and planning, to provide comprehensive learning experiences to students pursuant to the adopted charter.
(iii) The extent to which the application considers the information requested in section 1719–A [Contents of Application] and conforms to the legislative intent outlined in section 1702–A [Legislative Intent].
(iv) The extent to which the charter school may serve as a model for other public schools.
Section 1719–A of the CSL, 24 P.S. § 17–1719–A, provides that an application to establish a charter school shall include, *inter*

*alia,* identification of the charter applicant, the name of the proposed school, the proposed governance structure of the school, the admission policy, procedures regarding suspension/expulsion of students, the financial plan for the school, a description of and address for the physical facility that will house the school, together with information regarding ownership of the facility and any lease arrangements, the proposed faculty and a professional development plan, a report of criminal history record for all persons having direct contact with the students, and an official clearance check for all persons having direct contact with students.

er Propel's failure to file a regional charter school application violated the provisions of the CSL.[4]

■ With respect to the first issue, the School District contends that, when it initially received the charter school application to establish Propel–McKeesport, the application was accompanied by only nine letters of support, and none of those letters were from parents. Moreover, the School District asserts, the letters were essentially form letters; one letter referred erroneously to a proposed Propel charter school in another school district; another letter of support was withdrawn; and, in any event, the letters were too general in nature to constitute substantial evidence of sustainable support. Further, the School District argues, at the public hearing, the applicant failed to present any letters in support of its application from parents, teachers or students in the McKeesport Area School District, and it also failed to establish that it had preregistered any students in its program.[5]

However, in making these arguments, the School District fails to acknowledge the CAB's salient role as ultimate factfinder. We have "held that the CAB did not err in conducting *de novo* review over appeals from charter denials by local school boards even when the CAB fails to conduct a *de novo* hearing." *See Souderton Area Sch. Dist. v. Souderton Charter Sch. Collaborative*, 764 A.2d 688, 694 (Pa. Cmwlth.2000) [citing *West Chester Area Sch. Dist. v. Collegium Charter Sch.*, 760 A.2d 452 (Pa.Cmwlth.2000) (*Collegium I* ), *affirmed*, 571 Pa. 503, 812 A.2d 1172 (2002)] (footnote omitted). Furthermore, we have explained:

> In determining whether an application has established demonstrated, sustainable support, we previously stated our agreement with the CAB that such support "is to be measured in the aggregate and not by individual categories" and concluded that "failure to demonstrate strong support in any one category is not necessarily fatal to [a] charter school application."

*Carbondale Area Sch. Dist. v. Fell Charter Sch.*, 829 A.2d 400, 405 (Pa.Cmwlth.2003) (citation omitted).

Here, the CAB explained that "Propel submitted petitions of support containing the names of 497 persons, of which [sic] 237 were parents who requested enrollment information. In addition, 210 of the parents and 423 of all signers were residents of the School District. Propel also submitted letters of support from residents, foundations, businesses and elected officials." CAB Opinion (Docket No. CAB 2004–1, mailed October 15, 2004) at 10. While the CAB further noted that "there is some dispute between the parties relating to the quality of the petitions or the exact number of letters of support," *id.*, it also determined that the record as a whole showed substantial support for the charter

---

4. The CAB is "the administrative agency charged with exclusive review of an appeal of a local school board decision not to grant a charter application"; thus, our "scope of review is appellate." *Souderton Area Sch. Dist. v. Souderton Charter Sch. Collaborative*, 764 A.2d 688, 692 n. 8 (Pa.Cmwlth.2000). Accordingly, we shall here affirm the CAB's decision unless we determine that its adjudication violates the law or is unsupported by substantial evidence. *See id.*

5. We note that the School District does not challenge in its brief to this court the number of names/signatures contained in the petitions of support for the charter school submitted by Propel–McKeesport at the School District hearing on September 3, 2003. By signing those petitions, the signers indicated that they "are excited about the idea of a Propel Charter School in the McKeesport Area School District. Please approve the charter application." Certified Record (C.R.), Item 7B.

school. Moreover, the CAB determined, based on previously unavailable information submitted to it at the June 29, 2004, CAB hearing, that "[t]here is no better evidence of that sustainable support than the information Propel submitted regarding the 'pre-enrollment.' Specifically, Propel submitted the names, addresses and grades of 168 pre-enrollment applicants for the proposed charter school, which clearly evidences the level of support in the aggregate as required by the CSL." *Id.* (footnote omitted).[6] Based on our review of the record, we agree with the CAB that, taken in its entirety, the information submitted by Propel is sufficient to prove demonstrated, sustainable support for its charter school application.

■ Next, the School District asserts that Propel failed to show that it had the capability of providing a comprehensive learning experience to students because its student progress assessment program, as identified in its application, is seriously deficient; its academics in the "core areas" of language arts, social studies, math and science do not appear as if they will produce results superior to those courses offered by the School District; Propel's vague and general outline of its special education program, as contained in its application, is inadequate, as is its proposed budget, which fails to consider how much more costly it is to educate students with special needs than those receiving a regular education; and Propel's application fails to identify a discipline policy, explain what would happen to an expelled pupil, or provide for training of the staff with respect to student discipline problems.

■ "Section 1717–A(e)(2)(ii) of the [CSL], 24 P.S. § 17–1717–A(e)(2)(ii), requires an applicant to demonstrate that it is capable of providing the comprehensive learning experience it proposes." *Cent. Dauphin Sch. Dist. v. Founding Coalition of the Infinity Charter Sch.*, 847 A.2d 195, 201 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 580 Pa. 707, 860 A.2d 491 (2004). Section 1719–A(5) of the CSL, 24 P.S. § 17–1719–A(5), provides that an application to establish a charter school shall include information regarding "[t]he mission and education goals of the charter school, the curriculum to be offered and the methods of assessing whether students are meeting educational goals." Further, Section 1702–A(1), (2), and (6) of the CSL, 24 P.S. § 17–1702–A(1), (2), and (6), provides that the General Assembly's intention in enacting the CSL is, *inter alia*, to "[i]mprove pupil learning"; "[i]ncrease learning opportunities for all pupils"; and "[h]old the schools established under this act accountable for meeting measurable academic standards and provide the school with a method to establish accountability systems." In this regard, the CAB noted, and the record reflects, that, despite having one fewer report card, Propel demonstrated that it would sufficiently assess the students' work and whether the students are meeting their educational goals. For example, Propel's application indicates that students' performance levels would be gauged during orientation; the school intends to review the students' progress on a weekly basis; parents would receive a summary report three times a year; literacy would be assessed on a regular basis through "reading inventories;" and the stu-

---

6. Section 1717–A(i)(6) of the CSL, 24 P.S. § 17–1717–A(i)(6), provides that "[t]he appeal board shall have the discretion to allow the local board of directors and the charter school applicant to supplement the record if the supplemental information was previously unavailable." The School District does not expressly argue in its brief to this court that this information was previously available to Propel, and the CAB did not conclude as such. *Cf. Carbondale Area Sch. Dist.*, 829 A.2d at 404–05.

dents would undergo annual standardized testing. Moreover, as the CAB also noted, Propel's curriculum encourages learning and provides increased learning opportunities and "[t]he CSL does not require that the charter school 'go over and above' the programs of the School District in order to be an appropriate alternative[.]" CAB opinion at 11.

As well, Section 1719–A(9) of the CSL, 24 P.S. § 17–1719–A(9), provides that an application to start a charter school shall include "[t]he financial plan for the charter school and the provisions which will be made for auditing the school. . . ." Here, the CAB noted that Propel demonstrated its ability to provide the comprehensive learning experience required by the CSL. It provided an itemized budget, with revenues and expenditures projected over four years, and its application indicates that it has received over $1 million in "private philanthropic support" (Charter school application at 23). As for the School District's complaint that Propel's financial plan does not satisfactorily provide for special education needs, this court has previously rejected the notion that the proposed charter school's budget must contain specific program allotments where the record supports a finding that the school can comply with the learning requirements of the CSL. *See Central Dauphin School District,* 847 A.2d at 202, wherein we stated:

Although [the school district] asserts that the plan was inadequate because there was no money dedicated for physical education, the teacher salaries were too low, and it budgeted an inadequate amount for computers and art supplies, the Law does not require such specifics in the budget as long as the school board or upon appeal the Board can determine that the applicant is capable of providing a comprehensive learning experience for students.

(Footnote omitted).[7]

Furthermore, Section 1719–A(7) of the CSL, 24 P.S. § 17–1719–A(7), provides that an application to establish a charter school shall include "[p]rocedures which will be used regarding the suspension or expulsion of pupils" and such "procedures shall comply with [S]ection 1318 [of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 13–1318]."[8] Although the CAB did not make a specific finding in this regard, Propel's application sufficiently contained such information in accordance with Section 1318 by providing that the school principal will investigate serious behavior incidents; thereafter, he will have the authority to assign consequences including suspensions; prior to assigning a suspension of over three days, he will hold an informal hearing, after which a student may be suspended from school for as much as ten days; and, if the principal believes a longer sus-

7. We note that, in its school design prospectus, Propel asserts that "appropriately certified teachers" will provide the services required by the Individualized Education Programs and that, inasmuch as possible, students will be mainstreamed. *See* prospectus at 11.

8. This section (Suspension and expulsion of pupils) provides:

Every principal or teacher in charge of a public school may temporarily suspend any pupil on account of disobedience or misconduct, and any principal or teacher sus-

pending any pupil shall promptly notify the district superintendent or secretary of the board of school directors. The board may, after a proper hearing, suspend such child for such time as it may determine, or may permanently expel him. Such hearings, suspension, or expulsion may be delegated to a duly authorized committee of the board, or to a duly qualified hearing examiner, who need not be a member of the board, but whose adjudication must be approved by the board.

pension is justified, he will refer the matter to the Board of Trustees, who will make a final adjudication after a formal hearing. We therefore reject the School District's broad contention, contrary to the conclusion of the Board, that Propel's application did not show that it had the capability of providing the comprehensive learning experience that it proposed.

■ Accordingly, we now confront the last question that the School District raises—*viz.*, whether Propel's failure to file a regional charter school application violated the provisions of the CSL. The School District contends that Propel should have filed an application for a regional charter school when it applied for a charter to establish Propel–McKeesport because Propel–McKeesport "is simply one school in a system or network of schools to be operated by the same non-profit corporation and the same Board of Trustees." Petitioner's brief at 14. Further, the School District argues that, by failing to file a regional charter school application, but nonetheless creating a network of schools, Propel subverted the authority of the local school boards and deprived them of input into the establishment of a regional charter school, in contravention of the CSL.

For guidance, we necessarily begin with a review of the controlling statute. Pursuant to Section 1703–A of the CSL, a

"Regional charter school" shall mean an independent public school established and operated under a charter from more than one local board of school directors and in which students are enrolled or attend. A regional charter school must be organized as a public, nonprofit cor-

poration. Charters may not be granted to any for-profit entity.

Further, we explained in *West Chester Area School District v. Collegium Charter School,* 760 A.2d 452, 462 (Pa.Cmwlth.2000)*(Collegium I), affirmed,* 571 Pa. 503, 812 A.2d 1172 (2002):

The CSL provides two possibilities for creating a charter school. Under section 1717–A of the CSL, an application to establish a single district charter school shall be submitted to the local board of school directors of the district where the charter school will be located, 24 P.S. § 17–1717–A(c), and that local board shall evaluate and grant or deny the application. 24 P.S. § 17–1717–A(e). Alternatively, under section 1718–A of the CSL, a multi-district regional charter school may be established, and the boards of school directors of one or more school districts may act jointly to receive and consider an application for a regional charter school. The applicant applies for a charter to the board of directors of any school district in which the charter school will be located. 24 P.S. § 17–1718–A(b).

■ In *Collegium I,* we rejected the contention that a charter school applicant must apply for a regional charter when it intended to draw its student body from more than one school district.[9] On appeal, our Supreme Court affirmed, even though the non-chartering school district would not be able to vote on the application and would lack authority to use the accountability methods provided to the chartering school district by the CSL. In reaching this conclusion, our Supreme Court ac-

---

9. In reaching this conclusion, we affirmed the decision of the CAB. We note that, of course, "[t]he CAB's interpretation of its governing statute is entitled to great deference." *Brackbill v. Ron Brown Charter Sch.,* 777 A.2d 131, 138 n. 7 (Pa.Cmwlth.2001), *petition for allow-* *ance of appeal denied,* 573 Pa. 673, 821 A.2d 588 (2003) and *petition for allowance of appeal denied sub nom., Harrisburg Sch. Dist. v. Ronald H. Brown Charter Sch.,* 573 Pa. 674, 821 A.2d 588 (2003).

knowledged that "[t]his statutory procedure may result in the non-chartering school district incurring financial obligations to the charter school when it has no control over the decisions being made on behalf of the charter school[,]" but determined that this concern was properly directed to the General Assembly. *West Chester Area Sch. Dist. v. Collegium Charter Sch. (Collegium II)*, 571 Pa. 503, 521, 812 A.2d 1172, 1183 (2002). The Court further noted that "the CSL unquestionably directs the applicant to file the charter school application in the district where the facility is to be located and grants accountability over the charter school only to the chartering school district." *Id.* at 521–22, 812 A.2d at 1183.

The Supreme Court essentially adopted our language in *Collegium I* when it reiterated:

> *Unless the charter school will be located in more than one school district, which is not the case here, the CSL does not set forth any particular set of circumstances that would require a charter school applicant to apply as a multidistrict regional charter school rather than a single district charter school.* Instead, the CSL leaves that choice completely up to the applicant, regardless of the anticipated geographic makeup of the student body.

*Id.* at 523, 812 A.2d at 1184 (quoting *Collegium I*, 760 A.2d at 463) (emphasis added).

Based in large part on this interpretation of the statutory language, the CAB in this case rejected the School District's assertion that Propel was required to apply for a regional charter. The CAB also noted that "[t]he record is devoid of any evidence of a set plan for any regional charter school by Propel." CAB opinion at 16. We agree.

Jeremy Resnick, the executive director of Propel Schools, testified at the public hearing before the local board of directors as follows:

> Contrary to some of the innuendo that is being circulated in the community, Propel Charter School is not an experimental business enterprise. We are a nonprofit organization with an exceptional group of trustees and advisors, strong financial support, and capable staff.
>
> We have just received a charter in Steel Valley School District. We're proud to be working to establish Propel Charter School McKeesport, but a separate nonprofit entity will receive the charter and operate the school.

Notes of Testimony (N.T.), Testimony of Jeremy Resnick, Hearing (dated September 3, 2003) at 15.

The record also reflects the following exchange:

> MR. SKEZAS: (school district board solicitor): ... Is this school in McKeesport independent of the school in Steel Valley?
>
> MR. RESNICK: Correct.
>
> ....
>
> MR. SKEZAS: Are there other charter schools that you will be applying for in other districts in this area?
>
> MR. RESNICK: We don't have a standard plan in the works right now. The idea that we have is to set up a network of schools that would include more than two. As I said earlier, Propel Charter School in McKeesport is a separate organization. It will have its own board.

*Id.* at 34–35.

Resnick further stated:

> Some of the individuals on the Propel Charter School Homestead board will serve on the Propel Charter School McKeesport board. As we indicate in the [August 18, 2003] letter [to Dr. Ste-

phen Tomaino, school district superintendent], the directors of Propel Charter School McKeesport will be drawn from the individuals that are involved in the governments of our existing organization and also from members that are championing the establishment of the Propel Charter School in McKeesport.

*Id.* at 37.

He also explained:

Maybe I can clarify for the board because, obviously, you're having confusion with this. Propel schools is the organization that received the charter to operate the school in the Steel Valley School District and is doing so. Propel schools, the same organization, is the organization that is presenting you with this school application. Because of concerns that each charter school should have its own board, a separate nonprofit organization will receive the charter and operate Propel Charter School McKeesport.

*Id.* at 66.

■■■■ "A prerequisite to the grant of a charter is the organization of the school as a nonprofit corporation governed by a board of trustees that possesses authority to decide matters relating to the operation of the school, subject to the school's charter." *Mosaica Acad. Charter Sch. v. Dep't of Educ.,* 572 Pa. 191, 200, 813 A.2d 813, 818 (2002) [citing Section 1716–A(a) of the CSL, 24 P.S. § 17–1716–A(a)]. Upon review of the CSL, we are satisfied that, as Propel asserts, the CSL does not prohibit

cross-membership of the charter schools' Boards of Trustees or ban one group of persons from applying for a charter for more than one charter school. Rather, we agree with the CAB that the only statutory provisos in this vein are that "[n]o member of a local board of school directors of a school entity shall serve on the board of trustees of a charter school that is located in the member's district[,]" Section 1716–A(b) of the CSL, 24 P.S. § 17–1716–A(b), and that "[i]n no event shall the board of school directors serve as the board of trustees of an existing school which is converted to a charter school...." Section 1717–A(b)(3), 24 P.S. § 17–1717–A(b)(3). Therefore, the fact that, as Resnick testified, "[s]ome of the individuals on the Propel Charter School Homestead board will serve on the Propel Charter School McKeesport board[,]" N.T., Hearing (dated September 3, 2003) at 37, is, indeed, irrelevant. Although Resnick's testimony also indicates that the charter schools will act in "parallel," with similar academic programs as well as the sharing of staff, where Propel, admittedly itself a non-profit corporation, intends to set up separate non-profit corporate entities in the various school districts, we are satisfied that Propel's plan does not contemplate a regional charter school, which would then require a regional charter school application to be filed.

For all of the above reasons, the order of the CAB is affirmed.[10]

---

10. Other than the process of approval of charters, the CSL does not seem to draw any distinction between regional charter schools and single-district charter schools. In other words, once approved, the funding and operation appear to be substantially identical. Here, with respect to approval, Propel has separately incorporated each charter school and sought approval from the district in which it was to be located rather than seeking approval from multiple districts for a single regional charter school with multiple campuses. Since McKeesport Area School District had the opportunity to review the charter application for the school at issue (although, of course, its decision was overturned by the CAB), we question whether McKeesport has suffered any harm from the fact that other districts were not required to vote on the instant charter or, for that matter, that other districts may have chartered other Propel schools.

## ORDER

AND NOW, this 20th day of December, 2005, the order of the State Charter School Appeal Board in the above-captioned matter is hereby AFFIRMED.